UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

ROBERT CLEVELAND MITCHELL, III,

                Petitioner,                Case No. 4:05-cv-58

v.                                    Honorable Wendell A. Miles

KURT JONES,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted by a Calhoun County jury of one count each of kidnaping, MICH. COMP. LAWS § 750.349, assault with intent to commit great bodily harm less than murder, MICH. COMP. LAWS § 750.84, assault with a dangerous weapon, MICH. COMP. LAWS § 750.82, and felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, together with two counts of felony firearm, MICH. COMP. LAWS § 750.227b. On March 14, 2002, he was sentenced as a fourth habitual offender, MICH. COMP. LAWS § 750.769.12, to respective terms of imprisonment of 35 to 60 years, 8 to 20 years, 4 to 15 years, 4 to 10 years and 2 years. In his amended *pro se* petition, Petitioner raises five grounds for relief, as follows:

    I.    PETITIONER ROBERT C. MITCHELL'S CONSTITUTIONALLY IMPERMISSIBLE CONVICTIONS AND SENTENCES MUST BE REVERSED AND VACATED FOR NEW TRIAL SINCE HE WAS DELIBERATELY AND INTENTIONALLY DEPRIVED OF HIS FUNDAMENTALLY PROTECTED SIXTH AMENDMENT RIGHT TO A FAIR TRIAL BEFORE A FAIR AND IMPARTIAL TRIBUNAL WHERE THE GOVERNMENT KNOWINGLY USED MATERIAL FABRICATED EVIDENCE DIRECTLY BEARING UPON THE CREDIBILITY AND

RELIABL[ITY] OF ITS[] TWO KEY WITNESSES IN ORDER TO
OBTAIN A TAINTED CONVICTION, AND, ALTHOUGH THE
GOVERNMENT KNEW OR SHOULD HAVE KNOWN OF THE
FALSITY, THEY DID ABSOLUTELY NOTHING TO CORRECT THE
FALSE IMPRESSION OF FACTS LEFT WITH THE JURY, THEREBY
VIOLATING PETITIONER'S CONSTITUTIONAL RIGHTS UNDER THE
SIXTH AND FOURTEENTH AMENDMENT[S], U.S.C.A. CONST, AMS
VI, XIV.

II.     THE TRIAL COURT COMMITTED AN OUTCOME DETERMINATIVE
ABUSE OF DISCRETION AND VIOLATED PETITIONER'S SIXTH
AND FOURTEENTH AMENDMENT DUE PROCESS AND
CONFRONTATION CLAUSE RIGHTS BY EXCLUDING, AS AN
EXCESSIVE REMEDY FOR TRIAL COUNSEL'S DISCOVERY
VIOLATIONS, SUBSTANTIAL EVIDENCE BEARING UPON THE
COMPLAINANT'S PROPENSITY TO OUTRIGHT LIE, BIAS AND
VINDICTIVENESS, THEREBY DENYING PETITIONER'S VESTED
CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND TO
"EFFECTIVELY" PARTICIPATE IN THE ADVERSARIAL TESTING
PROCESS VIOLATIVE OF U.S.C.A. CONST, AMS VI, XIV.

III.    THE TRIAL COURT COMMITTED AN OUTCOME DETERMINATIVE
ABUSE OF DISCRETION AND VIOLATED PETITIONER MITCHELL'S
FUNDAMENTALLY PROTECTED DUE PROCESS AND
CONFRONTATION CLAUSE RIGHTS TO "EFFECTIVELY" CROSS-
EXAMINE THE COMPLAINANT BY EXCLUDING MATERIAL
EVIDENCE OF THE COMPLAIN[AN]T'S MENTAL HEALTH
DISORDER OFFERED TO ESTABLISH WHY SHE WOULD FALSELY
ACCUSE PETITIONER, THEREBY DEPRIVING HIM OF A FAIR TRIAL
VIOLATIVE OF U.S.C.A. CONST, AMS VI, XIV.

IV.     DEFENSE COUNSEL'S DEFICIENT PRETRIAL PREPARATION
PERFORMANCE VIOLATED PETITIONER MITCHELL'S
CONSTITUTIONALLY PROTECTED SIXTH AMENDMENT RIGHT TO
A FAIR AND IMPARTIAL TRIAL, WHERE COUNSEL FAILED TO
DISCLOSE TO THE GOVERNMENT CRITICAL DEFENSE
DISCOVERY MATERIALS BEARING UPON THE COMPLAINANT'S
BIAS, PREJUDICE, VINDICTIVENESS, AND PROPENSITY TO
PURPOSEFULLY AND WILLINGLY LIE UNDER OATH AND
MALICIOUSLY FABRICATE EVIDENCE, RESULTING IN THE TRIAL
COURT'S EXCESSIVE DISCOVERY SANCTION EXCLUDING THE
DEFENSE EVIDENCE, THEREBY NOT ONLY UNDERMINING
CONFIDENCE IN THE RESULTS OF THE TRIAL, BUT DENYING

PETITIONER THE "EFFECTIVE" ASSISTANCE OF COUNSEL, U.S.C.A. CONST, AMS VI, XIV.

V.     DEFENSE COUNSEL'S DEFICIENT PRETRIAL PREPARATION PERFORMANCE VIOLATED PETITIONER MITCHELL'S CONSTITUTIONALLY PROTECTED SIXTH AMENDMENT RIGHT TO A FAIR AND IMPARTIAL TRIAL, WHERE COUNSEL FAILED TO DISCLOSE TO THE GOVERNMENT CRITICAL DEFENSE DISCOVERY MATERIALS BEARING UPON THE COMPLAINANT'S BIAS, PREJUDICE, VINDICTIVENESS, AND PROPENSITY TO PURPOSEFULLY AND WILLINGLY LIE UNDER OATH AND MALICIOUSLY FABRICATE EVIDENCE, RESULTING IN THE TRIAL COURT'S EXCESSIVE DISCOVERY SANCTION EXCLUDING THE DEFENSE EVIDENCE, THEREBY NOT ONLY UNDERMINING CONFIDENCE IN THE RESULTS OF THE TRIAL, BUT DENYING PETITIONER THE "EFFECTIVE" ASSISTANCE OF COUNSEL, U.S.C.A. CONST, AMS VI, XVI.

(Am. Pet. ¶3.)  Respondent filed an answer to the petition (docket #18) stating that the grounds should be denied because they are without merit.  Upon review and applying the AEDPA standards, I find that all of Petitioner's grounds lack merit.  Accordingly, I recommend that the petition be denied.

### Procedural History

**A.  Trial Court Proceedings**

The state prosecution arose from an incident involving Deborah Gordon, with whom Petitioner had been romantically involved.  Petitioner tied Gordon up, restrained her for nearly eight hours, physically assaulted her and threatened her with her own gun.  Petitioner's defense was that Gordon fabricated the incident because she was vindictive and angry at the fact that Petitioner had not broken off his engagement with his girlfriend.  Petitioner also contended that he was an activist paralegal in Battle Creek who was involved in various lawsuits against the City of Battle Creek and

that his prosecution was based on a conspiracy among city police and other officials designed to end Petitioner's litigation efforts.

Petitioner was charged with one count each of kidnaping, assault with intent to commit great bodily harm less than murder, felonious assault and being a felon in possession of a firearm, together with two counts of felony firearm. Following a preliminary examination on May 21, 2001, he was bound over on all charges. A supplemental information was filed charging petitioner as a habitual offender, fourth offense. Petitioner was tried before a jury beginning February 19, 2002, and concluding on March 1, 2002.

Deborah Lynn Gordon testified that she met Petitioner in August 1999, and they became sexually involved in October 1999. (Tr. II at 10-11, 13.)[1] Petitioner informed Gordon early in their relationship that he was living with another woman, Grace Cowens. (Tr. II at 12.) The sexual encounters between Gordon and Petitioner nearly always occurred at Gordon's home, and the relationship was secret from his friends and family. (Tr. II at 13-14.) Gordon testified that, since the time she complained of Petitioner's criminal actions, she had received continuous threatening and obscene telephone calls about her allegations. (Tr. II at 16.) As a result of those calls, Gordon moved out of state for nearly nine months. (Tr. II at 16.)

---

[1]The trial transcripts will be referred to as follows:
Tr. I      Trial Transcript Vol. 1, Feb. 19, 2002 (docket #28)
Tr. II     Trial Transcript Vol. 2, Feb. 20, 2002 (docket #29)
Tr. III    Trial Transcript Vol. 3, Feb. 21, 2002 (docket #30)
Tr. IV     Trial Transcript Vol. 4, Feb. 22, 2002 (docket #31)
Tr. V      Trial Transcript Vol. 5, Feb. 26, 2002 (docket #33)
Tr. VI     Trial Transcript Vol. 6, Feb. 27, 2002 (docket #34)
Tr. VII    Trial Transcript Vol. 7, Feb. 28, 2002 (docket #36)
Tr. VIII   Trial Transcript Vol 8, March 1, 2002 (docket #37)
Tr. IX     Trial Transcript Vol. 9 (Sentence), March 14, 2002 (docket #38).

When Gordon met Petitioner, he did not have a steady job and did not own a vehicle. (Tr. II at 17.)  He sometimes drove either Grace Cowen's car or Mary Gault's car.  (Tr. II at 17.) Petitioner usually came to Gordon's house between 8:30 and 9:30 a.m. and left by 2:00 or 2:30 p.m. because those were the hours Cowen was teaching school.  (Tr. II at 18.)  At the end of June 2000, Gordon decided to tell Cowen of her relationship with Petitioner.  She did so because Petitioner had promised to leave Cowen but had not done so, and Gordon was tired of the lies.  (Tr. II at 19.)  She wrote two letters to Cowen, describing her relationship and becoming explicit about her sexual relationship with Petitioner.  (Tr. II at 19.)  On Monday, July 10, 2000, Petitioner came to Gordon's house to tell her he did not like the fact that she had written the letter to Cowen.  After discussion, the two made love, and Petitioner spent the night.   (Tr. II at 20-21.)   Petitioner never again mentioned Gordon's letter to Cowen.  (Tr. II at 35.)  Petitioner at some point moved three suitcases of clothing and a box of paperwork to Gordon's home.  (Tr. II at 21.)  On the morning of July 11, Gordon had a doctor appointment and Petitioner was scheduled to have a meeting with community activists.  (Tr. II at 22.)  She returned from the doctor's office at about noon, and Petitioner also eventually returned home.  At about 11:30 that night, at Petitioner's request, Gordon called Grace Cowen to try to explain that the letters were a lie, but Cowen did not want to talk and cursed Gordon.  (Tr. II at 23-24.)  Shortly thereafter, the police came to the house.  When the police arrived, Petitioner hid.  Gordon promised not to call Cowen again.  (Tr. II at 23-25.)  Gordon and Petitioner made love again.  (Tr. II at 24.)

On the morning of July 12, Gordon picked up her son at about 7:45 to take him to the Detroit airport.  (Tr. II at 25-26.)  Shortly before noon, she stopped at her doctor's office to pick up new medication and then went to the Rite Aid.  (Tr. II at 26.)  She returned home at about 1:20 p.m.

From a conversation with Petitioner, she knew that Petitioner planned to have lunch with Cowen and that he had a meeting with an attorney in the afternoon. (Tr. II at 27.) As Gordon drove from the Rite Aid toward home, she saw Cowen's vehicle parked in a restaurant parking lot. (Tr. II at 28.) She did not know if Petitioner was at the restaurant, but she continued driving to Cowen's house. She told a man sitting on Cowen's porch, "If Mr. Mitchell should happen to come back would you please have him come to my home and pick up his stuff." (Tr. II at 29.) Gordon then drove home. (Tr. II at 30.) After arriving home, she called Grace Cowen's house twice. (Tr. II at 30.) At approximately 2:00 or 2:15 p.m., a black woman driving a blue car, whom Gordon now knows to be Peggy Dean, dropped Petitioner off at Gordon's home. (Tr. II at 31-32.) Gordon testified that, after arriving, Petitioner told Gordon about his lunch with Cowen and used the phone a few times. At about 3:30 or 4:00 p.m., Nicole Sparks (Gordon's daughter-in-law) and Sparks' father, Ricky Horton, stopped at the house and they sat talking at the table. Ricky made a call to the Veteran's Administration Hospital at about 4:30 p.m. (Tr. II at 33.) Petitioner told Nicky that he and Gordon were going to the Wooten's home in Marshall, and Nicky invited Petitioner and Gordon to stop at her house in Marshall if they had a chance. (Tr. II at 34.)

Petitioner and Gordon left for Marshall at approximately 5:00 or 5:30 p.m. They stayed at the Wooten's house not more than ten minutes. (Tr. II at 35.) Petitioner gave Sue Wooten some paperwork, and Gordon and Petitioner returned home. (Tr. II at 36.) Gordon prepared dinner and they ate. At about 7:00 or 7:30 p.m., Gordon told Petitioner she was going to take a shower because she was not feeling well. (Tr. II at 36-37.) She showered and laid down in her daughter's room because Petitioner was on the telephone downstairs. She awoke and went downstairs at approximately 10:30 p.m. She found Petitioner sitting at the kitchen table with his head in his

hands. (Tr. II at 37, 53.) When he saw Gordon, Petitioner told her that they needed to talk. (Tr. II at 37.) Petitioner told Gordon that Cowen was not going to take him back and that he loved Cowen. Gordon told Petitioner that she did not want to hear it, as it was between them. Petitioner stated, "I didn't know who I was fuckin with, I didn't know who her family was or what they would do to me." (Tr. II at 37.) Gordon had the phone in her hand. (Tr. II at 38.) Petitioner then slammed his hands on the table and said he was going to sleep somewhere else. He asked to use her phone, and she told him to use the pay phone. (Tr. II at 38.) She backed out of the kitchen to the dining room with the phone and told him that he could stay downstairs and she would sleep upstairs. (Tr. II at 38.) She started to dial 911 and told Petitioner that he was scaring her. (Tr. II at 38.) Petitioner took the phone from her hands, hit her across the face, and told her, "He would call 911 after he got done killing me." (Tr. II at 38.) Gordon asked him to stop, but he told her, "No, bitch you took away my car, you took away my house, you took away the money, anything I had because Grace had you taking it away from me now, and you're going to pay for it." (Tr. II at 39.) Gordon testified that she next remembered sitting on the couch with Petitioner straddling her and hitting her in the face. (Tr. II at 39-40.) He then began to strangle her, and she remembered reaching up with her hand to scratch him so that, if he killed her, there would be some DNA. She was not sure if she succeeded in scratching him. (Tr. II at 40.) Gordon fought Petitioner and tried to pry his fingers off her throat. (Tr. II at 41.) He was only using one hand at that time. (Tr. II at 42.) She became lightheaded and dizzy. (Tr. II at 42.) Gordon testified that she believed she lost consciousness at that time. (Tr. II at 42.) Petitioner released his grip and stood up, and Gordon attempted to kick him in the groin. (Tr. II at 43, 211.) Gordon repeatedly asked Petitioner to stop, telling him that she had had enough. (Tr. II at 43.) He came back at her again and began to choke her again, this time with

two hands.  (Tr. II at 43-44.)  Gordon passed out.  When she came to, she was lying on her stomach about four feet from the sofa in front of the television.  (Tr. II at 44, 47.)  Petitioner was trying to stuff the batting from a torn pillow into her mouth.  (Tr. II at 45.)  Gordon kept pulling the batting from her mouth, and Petitioner eventually stopped trying to put it back into her mouth.  (Tr. II at 46)  As she struggled, he said, "You fuckin bitch you're not going to lay still I'm going to have to beat your ass some more."  When Gordon would not lie still, Petitioner lifted her head by her hair and smashed her face into the floor.  (Tr. II at 45, 47.)   Gordon lost consciousness and she does not remember anything else until she woke up again on the couch.  (Tr. II at 47-48.)

Once Gordon was lying on the couch, Petitioner removed an extension cord from behind the loveseat.  (Tr. II at 48.)  He then tied Gordon's arms tightly over her head and attached the cord to the stair doorknobs.  (Tr. II at 49-51.)  Gordon attempted to loosen the cord but was unable to do so.  (Tr. II at 51.)  Petitioner then tied Gordon's feet to the bottom of the couch legs.  (Tr. II at 52.)  Petitioner tore a sheet into strips and gagged Gordon.  (Tr. II at 52.)  She remained tied up until approximately 6:00 a.m. the following day.  Petitioner came back into the room about five or six times that night.  At some point, Petitioner untied the gag and asked Gordon where her .22 caliber handgun was, intending to kill himself.  (Tr. II at 53-55.)  Gordon lied at first, telling Petitioner the gun was upstairs in her daughter's bedroom.  As he went toward the stair door, Petitioner said, "If you're lying you fuckin bitch I'm going to beat you till you're dead."  She replied by telling him the correct location: the downstairs dresser drawer of Gordon's bedroom, left hand top corner.  (Tr. II at 55.)  Petitioner left and returned holding her gun and some shells.  (Tr. II at 55.)  At Petitioner's demand, Gordon told him how to load the handgun.  (Tr. II at 56.)  Petitioner put the gun to Gordon's right temple and asked her if she had ever wondered what it would be like

- 8 -

to be shot in the head.  (Tr. II at 56-57.)  After scaring her, Petitioner took the gun away from her

head.  Over the next period of time put the gun into his own mouth a couple of times saying, "He

ought to shoot his own self."  (Tr. II at 57.)  During the time between getting the gun and eventually

leaving Gordon's house, Petitioner only struck Gordon one more time, in the face.  (Tr. II at 58.)

She eventually asked Petitioner for a glass of water and to be released to use the bathroom.  She did

not recall the order of her requests.  (Tr. II at 58-59.)  Although Petitioner told her she did not need

a glass of water, he brought her one.  (Tr. II at 59.)  He moved her gag slightly and then just dumped

the water in her face.  (Tr. II at 59.)  He did not, however, allow her to go to the bathroom, telling

her to urinate on herself, which she eventually did.  (Tr. II at 60-61.)  At approximately 5:30 and

5:45 a.m., Petitioner told Gordon that he was going to call Cowen again and that, when he got back,

he would untie Gordon.  She asked for his promise, which he gave her.  (Tr. II at 63.)

When Petitioner returned about 15 minutes later, he untied Gordon.  (Tr. II at 64.)

Gordon's hands were swollen and bruised, and Petitioner kissed her hands and told her not to worry,

the swelling would go down.  (Tr. II at 64.)  Petitioner's demeanor was calmer, and, after lying on

the couch for awhile, Gordon asked if she could get a shower at about 6:30 a.m.  Petitioner agreed.

Petitioner followed Gordon to the bathroom, and she told him that her daughter-in-law Nicole was

supposed to come to see her that day, but that she had better not because of the way Gordon looked.

(Tr. II at 65.)  Petitioner brought the phone to Gordon in the bathroom and she called Nicole.  (Tr.

II at 65.)  Gordon then took a quick shower, putting her nightgown and panties in the laundry basket

under the sink and then putting on a fresh nightgown and panties.  (Tr. II at 66.)  Gordon testified

that she usually was not up until several hours later, and her intention was to tip Nicole off that

something was wrong.  (Tr. II at 71-72.)  After she got out of the shower, Gordon looked in the

mirror.  She saw many bruises, swollen eyes, busted lips, strangulation marks on her throat, scratches and welts on her knees and ankles.  (Tr. II at 67.)  She then went into the kitchen, where Petitioner was standing.  (Tr. II at 66-67.)  Petitioner hugged Gordon and told her that he was sorry and he loved her, but she should listen to what he had to say.  (Tr. II at 67.)  He told her that he had prepared a spot for her on the sofa and that he would take care of her for the rest of the day.  (Tr. II at 67.)  She went and sat on the sofa.  (Tr. II at 68.)

        At approximately 7:30 a.m., Jerry Ball called from the Battle Creek Fire Department, and Petitioner let Gordon take the call.  (Tr. II at 65, 69.)  Ball inquired if Gordon had made a call to his home or to the fire department, and she told Ball that she had not, but that Robert Mitchell uses her phone.  He asked if Petitioner was at the house, and she said, "No."  (Tr. II at 69.)  After she hung up, the phone rang again, and Petitioner took the call, which again was from Ball.  Petitioner told Ball that "there was a problem going on and he would meet with them at 9 o'clock."  (Tr. II at 69.)  Petitioner called and talked to Ball again somewhat later.  (Tr. II at 71.)  At about 8:30 a.m., Gordon told Petitioner that she would like a popsicle or something that was cold.  (Tr. II at 68, 251.)  He told her that he would go get something if she came with him, but she declined, saying that people would see her face and know what happened.  She encouraged him to take the phones and take the car keys, knowing that she had a spare set of keys to the other car in the back room.  (Tr. II at 68.)  Petitioner took both telephones and the keys to all the vehicles and left the house at about 8:45 a.m.  (Tr. II at 73-74, 255.)  As soon as Petitioner reached the yield sign a short distance from the house, Gordon went to the laundry room to get the spare set of keys.  She was in her other car by the time he reached the second block, and she headed toward Marshall.  (Tr. II at 75.)

- 10 -

When Gordon reached her daughter-in-law's house in Marshall, her daughter-in-law, Nicky Sparks, Gordon's two grandsons and Nicky's father, Ricky, were all present. (Tr. II at 75.) Gordon had been terrified during the drive, thinking that Petitioner was behind her. Nicky made some phone calls and got her ice. (Tr. II at 76.) By that time, a Michigan State Police trooper arrived. (Tr. II at 76.) Other officers and an ambulance came to the house. The ambulance drivers told Gordon that she had a concussion and needed to go to the hospital. (Tr. II at 257.) Gordon declined ambulance transport to the hospital, and Nicky subsequently drove her there. (Tr. II at 76, 257-58.) She briefly returned to her own home at 2:30 or 3:00 p.m., in order to pick up some clothing. (Tr. II at 77.) When she arrived, the house was full of police officers. (Tr. II at 77.) Gordon then went back to the home of her son, Eric, and his wife, Nicki, where she stayed until her daughter could fly home from Utah. (Tr. II at 77, 200.) She then stayed in a motel with her daughter for 14 days until she felt able to return home. (Tr. II at 77.) On July 21 or 22, she and her daughter Pam put locks on all the windows and bought new furniture. (Tr. II at 77). After she returned home, she found in her laundry basket the white shirt Petitioner had worn on the night of the assault. (Tr. II at 78.) She gave the shirt to police officer Laverne Brann. (Tr. II at 78.)

Upon questioning, Gordon testified that she had three natural children and could have no more as the result of surgery. She admitted, however, that she made a sarcastic comment about having Petitioner's child to Trace Christianson. (Tr. II at 78-79.) She also acknowledged that she had two convictions for writing checks without sufficient funds, in 1991 and 1992. (Tr. II at 79.) Gordon identified various exhibits, including her gun and clip, which Petitioner had used; her bed sheet, which had been on her bed before the assault; the strips of bed sheet used to gag her; her telephone cradle, which she denied knowing had been put in the kitchen wastebasket; cotton batting

- 11 -

similar to what had been placed in her mouth, which she denied knowing had been put in the wastebasket; a pillow cover that was on her loveseat on the morning before the assault; her comforter, which had been on her bed that morning; her duvet cover, which she last saw folded across the end of her bed on the morning of the assault; green crocheted blanket from her couch; the cover for her sofa, which was on the sofa as part of the furniture; the base of her other cordless phone, which had been on the dining room wall before the assault; a drinking glass; the extension cord that was used to tie her arms; the nightgown and panties she had been wearing at the time of the assault and which she left in the downstairs bathroom clothes basket; her telephone, which she had last seen the morning Jerry Ball called; the shirt Petitioner had been wearing the night of the assault and which he had removed before leaving the house.  (Tr. II at 80-95.)  She also identified photographs of various parts of her house, as well as photographs of the injuries to her face, tongue, hands, wrists, shoulder and chin.  (Tr. III at 96-130.)

On cross-examination, defense counsel attempted to introduce into evidence the letters written by Gordon to Cowen to impeach Gordon.  (Tr. II at 145-46.)  The prosecutor objected because the letters had not been produced as requested by the prosecution and were in violation of the disclosure rules.  (Tr. II,146-47.)  The court held that the letters would not be permitted into evidence because of the clear discovery violation.  The defense was permitted to use the general content of the letters for purposes of cross-examination, but the court refused to permit defense counsel from asking questions that quoted the letters themselves.  (Tr. II at 150-53.)  Thereafter, Gordon was cross-examined about the letters she sent to Cowen and about the motive for sending those letters.  (Tr. II at 153-61, 165-66.)

Nicole Sparks testified that she had been Gordon's daughter-in-law for two years. (Tr. III at 23.) Through Gordon, she came to know Petitioner about three years before the trial. (Tr. III at 24.) On July 12, 2000, she went to Gordon's house with her father and her two sons, ages six months and two years. (Tr. II at 24.) At about 5:00 p.m., Sparks was returning from taking her father for a doctor's visit and stopped to make a telephone call about one of her father's prescriptions. (Tr. III at 25.) Petitioner was present at the home. Contrary to his usual practice, Petitioner did not hug her or talk to her. (Tr. III at 25-26.) They stayed approximately 15 to 20 minutes. (Tr. III at 27.) Sparks next spoke to Gordon the following morning at approximately 8:00 a.m. (Tr. III at 28.) Sparks thought the call was strange, as Gordon usually slept late, and she laughed about it at first. (Tr. III at 28.) When she hung up, she felt that something was not right. (Tr. III at 28.) At about 9:00 a.m., Gordon arrived at Sparks' house, looking "roughed up." (Tr. III at 29.) Sparks testified that Gordon's eye was swollen, as was the rest of her face. As soon as she looked at Sparks, Gordon began to cry. Sparks asked who had caused the injuries and Gordon did not immediately reply. When Sparks stated, "It was Robert," Gordon admitted, "It was Robert." (Tr. III at 30.) Gordon was wearing a nightgown, her son's high school jacket and flip-flops. (Tr. III at 30.) Sparks was angry, not only that it had happened, but that her children had had to see their grandmother in that condition. (Tr. III at 30.) Sparks brought Gordon into the house and sat her down on the couch. Sparks called Gordon's house, and the phone was answered immediately and then hung. (Tr. III at 31.) She called again a minute later and left a message for Petitioner, called him names and telling him that she hoped that terrible things happened to him and that he went to prison. (Tr. III at 32.) Sparks got ice and her father took it into Gordon in the living room. (Tr. II at 32.) Right after she left the message, Sparks called 911, telling the dispatcher that Robert

Mitchell had beaten Gordon.  (Tr. III at 33.)  The police and an ambulance arrived.  After the ambulance paramedics talked to Gordon, they wanted to transport her to the hospital.  Gordon, however, wanted to go on her own, and she asked Sparks to drive her.  (Tr. III at 33.)  Sparks drove Gordon to the hospital, where she was treated and pictures were taken.  (Tr. III at 34.)  After Gordon was discharged, the two drove to Gordon's home, where a number of police officers were still present.  (Tr. III at 34.)  She then drove Gordon to Sparks' home.  (Tr. III at 34.)  Until her mother-in-law told her, Sparks did not realize that Gordon had been confined at her home the preceding night and that morning.  (Tr. III at 34.)  Prior to the incident, Sparks liked Petitioner and thought he was nice.  (Tr. III at 25, 35.)

The audiotape of the 911 call was played for the jury.  When Sparks told the 911 dispatcher that Petitioner had committed the assault, the dispatcher did not immediately realize whom she meant, though he knew who Mitchell was.  (Tr. III at 58.)

Michigan State Trooper Denise Rule testified that she responded to Sparks' Marshall address within two to three minutes of being called by the 911 dispatcher.  (Tr. III at 65.)  She observed that Gordon had a black eye and had swollen wrists with what appeared to be rope marks around them.  (Tr. III at 66.)  She also observed that Gordon's tongue was blue.  (Tr. III at 87.)  Rule testified that the photos taken of Gordon in People's Exhibits ##15A, 15B, 15F and 15G were all consistent with what she had observed.  (Tr. III at 86.)  Rule contacted the Battle Creek Police Department and then called an ambulance.  (Tr. III at 66.)  A sergeant from the Battle Creek Police Department called back to the home and told Rule that Gordon needed to go back to Battle Creek to file a complaint.  (Tr. III at 84-85.)

Marshall paramedic Brent Cornwell testified that he and his partner Bob Hale were dispatched in an ambulance to Sparks' Marshall address on a reported assault.  Cornwell and Hale met with a woman identified on the report as Deborah "Gourdir."  (Tr. III at 92, 94-95.)  The woman was distraught and had abrasions around her mouth, a swollen and lacerated tongue, and red marks on the right side of her face and neck.  (Tr. III at 93.)

Battle Creek Police Sergeant McClenney spoke with Trooper Rule after she had called the Battle Creek Police Department.  (Tr. III at 111-12.)  McClenney initiated a complaint, and he left the Battle Creek Police Department accompanied by Officer Tom Rivera to meet Gordon at the Battle Creek Health Care System.  (Tr. III at 112, 129.)  The officers went to the hospital to meet Gordon.  (Tr. III at 112, 130.)  McClenney testified that he knew Deborah Gordon, who was married to one of his uncles.  (Tr. III at 122.)  Because of the family relationship, McClenney asked Officer Rivera to conduct the interview, to be certain of objectivity.  (Tr. III at 122.)  Gordon was very upset and told the officers that she had been assaulted by Petitioner.  (Tr. III at 112-14, 127.)  McClenney was aware that Petitioner was well known in the community and had some prior history challenging the police department, so he called Detective Brann to make sure that everything was handled without mistakes.  (Tr. III at 114, 169.)  After they interviewed Gordon, McClenney and Rivera went to her home at 87 Nelson in Battle Creek.  (Tr. III at 135.)  He also asked for additional units to meet him at the address.  (Tr. III at 135.)  Four other officers responded.  (Tr. III at 136-37.)  McClenney testified that he understood that Robert Mitchell was armed and could be in the house.  (Tr. III at 115, 137.)  After entering the house and determining that Mitchell was not there, McClenney and Rivera went to Grace Cowen's address at 180 Kingman.  (Tr. III at 117, 145.)  McKenney testified that he knew Cowen and asked her for permission to search the house.  (Tr. III

- 15 -

at 117.)  McClenney was concerned about the possible danger of a suspect wielding a firearm in a neighborhood filled with children.  (Tr. II at 117.)

Dr. Elaine Schniderman testified that she was an emergency department physician at Battle Creek Health Care System.  (Tr. III at 173.)  On July 13, 2000, she examined Deborah Gordon in the emergency room.  (Tr. III at 174.)  Gordon had bruising around her eyes, abrasions to her neck, areas of redness on her neck, and bruising of her tongue.  (Tr. III at 177.)  She also had a punctured wound on her right hand, swelling of both hands and redness of both wrists.  (Tr. III at 177-78.)  Schniderman ordered a CAT scan of Gordon's brain and facial bones and x-rays of her left shoulder and right wrist.  (Tr. III at 178.)  Gordon was given a milligram of Ativan for anxiety and a tetanus shot.  (Tr. III at 178-79.)  She also was given a prescription of Augmentin, an antibiotic, and Vicodin for pain.  (Tr. III at 179.)  A nurse, Paula Kohlhaas, testified similarly about Gordon's injuries.  (Tr. III at 182-186.)  Kohlhaas also obtained fingernail scrapings, which she gave to Officer Diepenhorst.  (Tr. III at 185-86.)

Battle Creek forensic technician Jennifer Diepenhorst testified that she met Officers Rivera and McClenney at Battle Creek Health Systems.  She took the exhibit photographs of Gordon's injuries.  (Tr. III at 188-89.)  She also assisted Nurse Kohlhaas in obtaining nail scrapings, which she transported back to the station.  (Tr. III at 191.)

Battle Creek Police Officer Tom Rivera testified that, on July 13, 2000, he accompanied Sergeant McClenney to the Battle Creek Health system, where he interviewed Deborah Gordon.  (Tr. III at 209.)  He observed that Gordon was dressed in a nightgown and had obvious bruises and swelling on her face and neck.  (Tr. III at 209-10.)  Gordon was crying and clearly upset. Rivera asked who had caused the injuries and Gordon identified Petitioner as the assailant.  (Tr. III

at 210.)  Gordon gave the officers permission to go to her house.  Rivera and McClenney went to secure the crime scene and to look for Petitioner.  (Tr. III at 210-11.)  The Detective Bureau had arrived at the hospital by this time and Rivera turned the interview of Gordon over to them.  (Tr. III at 213.)  When McClendon and Rivera arrived at Gordon's home, the front door was open, but Petitioner was not at the house.  (Tr. III at 211.)  Other officers also were present, including Esteven Rivera.  (Tr. III at 211.)  Tom Rivera denied that the Emergency Response Team was present at Gordon's address.  (Tr. III at 212.)  After searching the house, Tom Rivera, McClendon, Esteven Rivera and Officer Wise, as well as other officers, went to 180 Kingman, Grace Cowen's address, seeking Petitioner.  (Tr. III at 211.)

Battle Creek Police Officer Thomas Corbin testified as the crime scene technician who processed the scene at Gordon's address.  (Tr. III at 218.)  Under the direction of lead investigator Detective Brann, Corbin searched the residence, photographed the scenes and collected evidence.  (Tr. III at 219.)  Corbin identified the nickel-plated .22 caliber semi-automatic pistol he collected from the washing machine on the first floor of the residence, to which he had been directed by Sergeant Detective Bright.  (Tr. III at 221; Tr. IV at 17, 21.)  He ran a Law Enforcement Information Network (LEIN) check on the weapon and found it was registered to Deborah Gordon. (Tr. III at 221.)  Corbin also identified various other exhibits and photographs  (Tr. III at 222-44.) Among others, he identified Exhibits 1D and 1E, which were portions of a torn bed sheet collected from the washing machine.  (Tr. III at 222-23.)  He identified an 86½ -inch piece of telephone cord as Exhibit 2A, which he collected from the wastepaper basket in the kitchen, and a white extension cord as Exhibit 6, which he collected from the living room floor.  (Tr. III at 223.)  In addition, he identified Ex. 2B as white pillow stuffing and Ex. 2C as a maroon pillow case with a torn edge, both

of which he found in the kitchen waste basket.  (Tr. III at 224; Tr. IV at 8.)  Corbin identified

Exhibits 7B and 7C as a woman's nightgown and panties, respectively, both of which were found

in the bathroom laundry basket.  (Tr. III at 229.)  The locations of these and many other exhibits

closely corresponded with Gordon's descriptions of the incident.  Corbin also identified a telephone

handset that was found between the seats of the Nissan car parked in Gordon's driveway.  (Tr. III

at 230, 243.)

    Aire Malynn Pratt testified that she became acquainted with Petitioner at the C-Store

on East Columbia Street approximately two years before the trial.  (Tr. IV at 76-77.)  Pratt worked

second shift, and Petitioner typically came into the store every day after 5:00 p.m. to get a Detroit

newspaper and an Inquirer.  (Tr. IV at 77.)  Pratt later started working first shift, from 5:00 a.m. to

2:00 p.m.  On July 13, 2000, she was working first shift.  (Tr. IV at 77-78.)  At some time between

6:00 a.m. and 7:00 a.m., Petitioner came into the store and asked for change for the pay phone.  (Tr.

IV at 79.)  Pratt testified that it was unusual for Petitioner to be at the store at that hour.  (Tr. IV at

79.)  Petitioner appeared sweaty, shaky and kind of distraught.  He was dressed in a gray sweatshirt

and sweatpants and wearing sunglasses instead of his usual patch.  (Tr. IV at 79.)  Petitioner talked

with another man in the store, and Pratt overheard Petitioner say that "he was going to have to leave

town, maybe Detroit."  (Tr. IV at 80.)  Petitioner was in the store for 15 minutes or less.  Pratt then

saw him use the pay phone across the parking lot.  He remained on the phone for about three hours.

(Tr. IV at 80.)   Pratt identified the vehicle Petitioner was driving as that pictured in Exhibit 14B,

the vehicle Corbin saw parked in Gordon's driveway.  (Tr. IV at 81.)

    Sergeant Pierce of the Battle Creek Police Crime Lab testified that he was assigned

to assist in the investigation of the crime scene at Gordon's house.  (Tr. IV at 92.)  Pierce videotaped

- 18 -

the search with the sound turned off, except for the time during which he played the messages on the answering machine.  (Tr. IV at 93-94.)  The videotape was admitted as Exhibit 11A.  (Tr. IV at 95.)  Pierce also processed the scene for fingerprints, including the telephone, doorknobs and common areas upon which the suspect may have left prints.  (Tr. IV at 96-99.)  He found no latent identifiable prints on anything he checked.  (Tr. IV at 98.)  Pierce did not recall whether he dusted for fingerprints on the internal surfaces of the car that was parked in the driveway, though he acknowledged that dusting the vehicle would have been standard procedure.  (Tr. IV at 99, 103.)  On cross-examination, Pierce also acknowledged that his brother had been the subject of a police complaint that was filed with the assistance of Petitioner.  (Tr. IV at 102, 106.)

       Sandra Sue Wooten testified that she had known Petitioner since 2000, when her son was in some trouble with the law and Petitioner became involved in an attempt to help him.  (Tr. IV at 108.)  Petitioner came to Wooten's house on the afternoon of July 12, 2000, to give her some papers to send to her son.  (Tr. IV at 110.)  Petitioner got out of the passenger side of a vehicle that was being driven by a white woman whom Wooten did not know.  Wooten noticed because she was aware that Petitioner was engaged to Grace Cowen, a black woman.  (Tr. IV at 111.)  She later learned that the white woman was Deborah Gordon.  (Tr. IV at 111.)  As Petitioner was leaving, Wooten mentioned that she would see him at his wedding to Grace, to which she had been invited.  Petitioner responded that he and Grace were not getting along well at that time.  (Tr. IV at 112-13.)

       Battle Creek Police Detective Laverne Brann testified that after being paged by the department, he responded to the Battle Creek Health Center, where he spoke with Gordon.  (Tr. IV at 118-19.)  He observed that her eyes and the right side of her face were swollen, she had a cut lip, her tongue was swollen, and she had red marks or welts on her wrists.  (Tr. IV at 119.)  He then went

- 19 -

to her address.  (Tr. IV at 119.)  Brann was the lead investigator at the scene, and, based on what Gordon had told him, he collected relevant evidence.  (Tr. IV at 120.)  The house was neat, with the exception of disarray of bedding in the living room, consistent with the story Gordon told.  (Tr. IV at 121.)  He testified that the stairway door had an extension cord wrapped around the door handle, also consistent with Gordon's story, and he identified the photographic exhibit showing that scene. (Tr. IV at 122.)  Brann also identified the picture of the stuffing and the phone cord that Gordon had described being torn out.  (Tr. IV at 123.)  In addition, he testified that he had listened to the telephone message on the answering machine to find a phone message from Nicole Sparks consistent with the message she claimed to have left.  (Tr. IV at 124-25.)  Brann identified the gun found in the washing machine as consistent to the gun Gordon had described.  (Tr. IV at 125.)  He found a towel with melting ice and some popsicle wrappers on the dining room table.  (Tr. IV at 126-27.)  Brann testified that the cordless phone found between the seats of the black Nissan Altima in the driveway was consistent with Gordon's statement that the phone had been removed from the house when Petitioner left to get popsicles.  (Tr. IV at 127-28.)

Brann eventually examined Gordon's telephone records for July 12 and 13, 2000. (Tr. IV at 129.)  Using those records, he found the telephone numbers of Peggy Dean, George Kendall,  and the Veteran's Administration in Battle Creek.  (Tr. IV at 130-31.)  Gordon later gave a t-shirt to Brann, which she reported Petitioner had worn the night of the incident.  (Tr. IV at 133.) He also participated in obtaining a search warrant for blood samples from Petitioner.  (Tr. IV at 132.)  The results were compared to the DNA taken from the t-shirt.  (Tr. IV at 133.)  Brann testified that, after July 13, 2000, Petitioner was sought by police.  Nine months later, after Petitioner was featured on "America's Most Wanted" on March 18, 2001, the police received a number of tips that

Petitioner was living in Lansing.  (Tr. IV at 135.)  Working from those tips and in conjunction with the Michigan State Police, Brann found Petitioner at a Lansing address, where he was placed under arrest.  (Tr. IV at 135.)

Battle Creek Fireman Jerry Ball testified that he was on duty at a Battle Creek fire station on the morning of July 13, 2000, scheduled to go off shift at 8:00 a.m.  (Tr. Excerpt 2/22/02 at 5-6, docket #32.)  At 7:20 a.m., he received a telephone call from Petitioner, whom Ball knew through Petitioner's assistance concerning allegations of racial and gender bias within the fire department.  (*Id.* at 4, 7, 15.)  According to Ball, his relationship with Petitioner had caused him problems with the police chief.  (*Id.* at 5, 15.)  Ball testified that Petitioner seemed upset about something and did not sound like his usual self.  (*Id.* at 8-9.)  According to Ball, Petitioner also sounded like he was calling from outside because of traffic noises.  (*Id.* at 13.)  Petitioner told Ball that something was wrong and he wanted to talk with Ball, and they arranged for Petitioner to call Ball in an hour at a number Ball gave him.  (*Id.* at 9, 11.)  Petitioner never called. (*Id.* at 11.)  Ball denied any memory of having called Petitioner shortly before the 7:20 a.m. call, despite Gordon's phone record showing two brief calls from the station's private number and Ball's belief that no other officers at the station communicated with Petitioner.  (*Id.* at 7-8, 11.)

Daniel Freehling testified that he had been Petitioner's parole officer since June 1999.  (Tr. IV at 215.)  Freehling identified a certificate of judgment against Petitioner for the offense of false pretenses over $100.  (Tr. IV at 216.)  Freehling testified that, on July 12-13, 2000, Petitioner was subject to standard parole conditions that barred him from possessing a firearm.  (Tr. IV at 217-18.)  In July 2000, Petitioner suddenly ceased reporting for his parole meetings and was placed on absconder status.  (Tr. IV at 222.)

On the morning of the fifth day of trial, February 26, 2002, defense counsel raised numerous complaints about prosecution comments and late discovery that had prejudiced Petitioner. (Tr. V at 5-7.)  The court construed the narrative as a motion for mistrial, which it denied for lack of merit.  (Tr. V at 8.)

Laurence Simson testified as an expert in pathology and specialized forensic pathology.  (Tr. V at 10, 15.)  Simson testified that he examined the photographs of Gordon's injuries and had been able to determine the causes of those injuries. (Tr. V at 17.) Simson identified a black eye, reflecting a hemorrhage in the upper eyelid, which seeps down into the soft tissue below the eye.  He also identified bruising to the right side of the face and an abrasion on the chin.  (Tr. V at 17.) The black eye was caused by a blow to the eye area, whether with a fist, an elbow or other source.  The eye injury was caused by something that would get inside the orbit of the eye without striking the nose.  (Tr. V at 18.)  He also identified pinpoint hemorrhages or petechia hemorrhages, which are caused by compression to the neck of a living person.  (Tr. V at 18-19.)  Simson testified that the photos also showed bruising to the right side of Gordon's neck, which were consistent with pressure being placed on the neck.  (Tr. V at 19.)  According to Simson, Gordon also had a large bruise on the right side of the tongue.  (Tr. V at 20.)  The bruise could not have been caused by biting and required a considerable amount of force.  (Tr. V at 20.)  In addition, Gordon had a scrape on the inside of both the upper and lower lips consistent with having something compressed in the area.  The mouth injuries were consistent with a person having been gagged, forcing the tongue between the teeth, after which force applied upward on the bottom jaw caused the teeth to compress the tongue.  (Tr. V at 21, 29.)

- 22 -

With respect to Gordon's other injuries, Simson testified that the hands were very swollen and bound by a ligature with two bands, which could have been the extension cord found at Gordon's address.  (Tr. V at 23-24.)  The hands were tied tightly enough to allow blood in but to restrict flow out, which could have produced numbness in the hands.  (Tr. V at 24-26.)  Simson testified that he did not believe it was possible for the combination of injuries to have been produced by the individual herself.  (Tr. V at 26.)  In addition, Simson testified that if soft material had been pressed into a person's mouth, it would not necessarily contain condensed moisture if removed quickly.  (Tr. V at 27.)  The injury to the chin was consistent with having the face sideways toward the floor and being struck against the floor.  (Tr. V at 30.)  On cross-examination, Simson testified that there should have been a considerable amount of saliva on the material used to gag Gordon if she was bound for five to six hours.  There also should have been some detectable skin residue from the rubbing against the tongue and lips.  (Tr. V at 37.)

Ann Elizabeth Chamberlain testified that she was employed by the Michigan State Police Forensic Science Lab in the Biology Unit, where she performed serology processing of crime scene evidence for DNA analysis.  (Tr. V at 43-44.)  Chamberlain tested fingernail scrapings from Gordon but found no tissue or blood.  (Tr. V at 46-47.)  She tested the collar and armpit areas of a white t-shirt for the presence of blood and skin sluffage to identify the wearer.  (Tr. V at 47-49.)  She found a tiny amount of blood on the left side of the collar, which, had she sampled it, would have depleted the sample so as to prevent DNA analysis.  She forwarded it forensic scientist Jeffrey Nye.  (Tr. V at 49.)  She also tested Gordon's panties for the presence of urine.  (Tr. V at 50-51.)  In a sample taken from the back of the panties, she found a large amount of creatinine, indicating urine, and the panties also had a strong odor of urine and a yellowish stain.  (Tr. V at 51-52.)  She did not,

- 23 -

however, find the same results on the nightgown.  (Tr. V at 52-53.)  The amount of urine found on the panties was consistent with someone urinating on themselves rather than someone having a small amount of leakage.  (Tr. V at 60.)  Chamberlain also tested the comforter and found creatinine in one area and not in another.  (Tr. V at 53.)  The parties stipulated to the introduction of Jeffrey Nye's forensic report in lieu of his testimony at trial.  (Tr. V at 54.)

   Battle Creek Detective Sergeant Carter Bright testified that, as of July 13, 2000, he had held the position of sergeant in charge of the detective bureau for approximately three-and-one-half years.  (Tr. V at 67.)  On that date, he reported to Gordon's address to supervise the investigation that was then underway.  (Tr. V at 68.)  Bright stayed for a few minutes and then went to Cowen's house on Kingman Street, where a number of other officers had gone to look for Petitioner.  (Tr. V at 69.)  Bright stayed only a short while and then returned to Gordon's house on Nelson Street.  Bright had not yet entered Gordon's house when crime scene technician Corbin arrived.  He entered the home behind Corbin to assist in the priority search for the gun officers understood that Petitioner had used.  (Tr. V at 70.)  Bright did not seize anything, but began to look for the pistol.  (Tr. V at 72.)  After looking in the bedroom and living room, Bright noticed the laundry room, where the lid was up on the washing machine, revealing some dry bedding sticking up.  (Tr. V at 72-73.)  Bright thought the circumstances were unusual for the handling of laundry. He went over to the machine and pulled some of the material slightly, when he heard a "thunk."  He looked into the drum and saw a small caliber firearm.  (Tr. V at 73.)  Bright told Officer Corbin that he had found the gun, but Bright did not touch it.  (Tr. V at 74.)  Bright also called Sergeant McClenney to inform him that they had recovered the weapon.  (Tr. V at 74.)  Under standard policy, it was important to let McClenney, who was looking for Petitioner, know that Petitioner did

not have the weapon with him.  (Tr. V at 75.)  Bright testified that, as a result of his involvement in the investigation, he had been made the subject of a federal lawsuit, which was subsequently dismissed.  (Tr. V at 75-77.)

Michigan State Police DNA Analyst Stephen Milligan testified that he obtained DNA profile information from the samples sent by Chamberlain from the armpit and collar areas of the t-shirt.  (Tr. V at 139.)  He later received blood samples taken from Deborah Gordon and Petitioner, from which he obtained DNA profile information for comparison purposes.  (Tr. V at 140-41.)  Both the collar cutting and the underarm cutting indicated that there was more than one donor for the samples.  (Tr. V at 141-43.)  Petitioner's DNA had the probability of at least one in 120 quadrillion of being one of the donors on both samples.  (Tr. V at 143-45.)

Renee Garcia of Ameritech SPC authenticated the telephone records for Deborah Gordon's home phone number for July 12 to July 13, 2000, and those records were introduced into evidence.  (Tr. V at 163.)

State Police Trooper William Ford testified as commander of the Fifth District Fugitive Team about the efforts made to apprehend Petitioner between July 2000 and March 2001, when Ford and Battle Creek Detective Brann arrested Petitioner in Lansing, Michigan.  (Tr. V at 181-194.)

Battle Creek Police Officer Julie Hubbard testified that on July 12, 2000, she was investigating a complaint filed by Grace Cowens against Deborah Gordon.  (Tr. VI at 5.)  With the help of Deborah Gordon's telephone records, Hubbard recalled that she had attempted to telephone Gordon twice on July 12, once at 3:03 p.m. and again at 3:20 p.m.  (Tr. VI at 6-7.)  Hubbard testified that, when she reached Gordon, Gordon was argumentative.  (Tr. VI at 10.)  Shortly before calling

- 25 -

Gordon, Hubbard had taken the complaint in person from Cowen at Cowen's home address. (Tr. VI at 8.) Hubbard testified that Cowen's caller ID reflected two calls from Gordon's number on July 11, 2000 and 17 calls from Gordon's number on July 12, 2000. (Tr. VI at 11-12.)

Battle Creek Police Officer Alan Marlow testified that on July 14, 2000, he took photographs of Deborah Gordon's injuries. (Tr. VI at 14.) Gordon had several bruises, mainly in her whole face area, together with some bruising on her neck and hands. (Tr. VI at 15.) Marlow then identified certain picture exhibits as those he had taken. (Tr. VI at 16.) Civilian Crime Technician Tara Wesseldyk testified that she took additional pictures of Gordon's injuries on July 17, 2007. (Tr. VI at 17.) She identified other picture exhibits, showing an increase in the demonstrable bruising to Gordon's face. (Tr. VI at 18.)

Battle Creek Police Laboratory Specialist Joel Shepperly testified as an expert in fingerprint analysis and identification. (Tr. VI at 22-23.) Shepperly testified that he conducted fingerprint evaluations on the gun and cartridges but found only partial prints insufficient for identification. (Tr. VI at 31.) He testified that in only one in one hundred instances are identifiable prints found on handguns. (Tr. VI at 31.) Shepperly also examined six areas of fingerprint ridge detail on a green glass taken from Gordon's house. From those examinations, he identified Deborah Gordon's prints. (Tr. VI at 33-34.) Shepperly explained that frequently the prints of an individual who held a glass are obliterated by those of the person to whom the glass is subsequently handed. (Tr. VI at 35.) Shepperly obtained no identifiable prints from the cordless phone. (Tr. VI at 36.) The prosecution rested. (Tr. VI at 55.)

Petitioner moved for mistrial on the basis of the prosecution's introduction of evidence of other bad acts, including evidence of Petitioner's flight. The motion was denied. (Tr.

VI at 56-57.)  Petitioner then moved for directed verdicts on all charges.  (Tr. VI at 57-58.)  Those

motions were also denied.  (Tr. VI at 60-62.)  The court also granted the prosecution's motion to

exclude evidence of the PPO subsequently obtained by Grace Cowen against Deborah Gordon.  (Tr.

VI at 65-66.)  Petitioner engaged in a series of outbursts at the court's rulings and was escorted from

the courtroom.  (Tr. VI at 68-69.)  Defense counsel was warned to advise Petitioner that any further

outbursts would have him removed during the remainder of the trial proceedings.  (Tr. VI at 69-70.)

Petitioner returned before the presentation of the defense case.  (Tr. VI at 71.)

           Mary Gault testified that she had known Petitioner since 1998.  (Tr. VI at 72.)  She

also knew Grace Cowen and was very familiar with their relationship.  (Tr. VI at 73.)  The

relationship between Petitioner and Cowen began to deteriorate in June 2000.  (Tr. VI at 75.)  Gault

testified that she was aware of two letters from Deborah Gordon to Grace Cowen.  (Tr. VI at 75.)

Gault called Gordon in June or July 2000, and Gordon was threatening and rude.  (Tr. VI at 78.)

Gordon called Gault numerous times thereafter.  (Tr. VI at 79.)  Gault testified that, on July 10,

2000, she picked Petitioner up from Cowen's house at about 11:00 or 11:30 a.m.  (Tr. VI at 79-80.)

At that time, both Petitioner and Cowen appeared calm and collected.  (Tr. VI at 80-81.)  Petitioner

loaded some suitcases and files into Gault's car.  She drove him to the church at which she served

as minister, and Petitioner unloaded his belongings.  She had agreed to allow Petitioner to stay at

the church while she was at her annual church conference for the next week.  (Tr. VI at 81, 84.)

Petitioner then asked Gault to drop him off at Gordon's house.  (Tr. VI at 82.)  Petitioner was

carrying a stack of papers with him.  (Tr. VI at 82.)  Gault agreed to pick Petitioner up at Gordon's

at 9:30 a.m. on July 11, 2000.  (Tr. VI at 83.)  When she arrived, Petitioner was at the kitchen table

making a list of telephone numbers, including that of Jerry Ball.  (Tr. VI at 83.)  Petitioner handed

the list to Gordon, and Gault remembered to give Petitioner the phone card she had for him.  (Tr. VI at 84.)  Gault went to the grocery store to pick up items Petitioner needed while she was gone. (Tr. VI at 84.)  She also stopped to get keys made so that Petitioner could access the church.  (Tr. VI at 85.)  Gault dropped Petitioner off at the church and shortly thereafter left town until July 20, 2000.  (Tr. VI at 86.)  On cross-examination, Gault acknowledged that she had given a sworn deposition in November 2000 in which she told a series of half-truths or lies, including denying that she had had contact with Petitioner when she had visited with him in Lansing and had paid for his hotel there.  (Tr. VI at 89-106.)  Gault denied knowing either Patricia Martin or Angela McKenzie. (Tr. VI at 96).

Jim Boyer, a former employer of Gordon's, testified that Gordon had a reputation for being dishonest.  (Tr. VI at 111-15.)  On cross-examination, Boyer testified that Gault would come in to his business and pay for Petitioner's dry cleaning.  (Tr. VI at 116.)

George Johnson testified that, at about 8:00 a.m. on July 13, 2000, Petitioner came to his home and asked, "What's for breakfast?"  (Tr. VI at 117, 129.)  Petitioner was a neighbor of Johnson's while he was living with Cowen, and he frequently dropped in for breakfast.  (Tr. VI at 117-18.)  Mitchell stayed until about 10:30 a.m., when he left for a meeting in Kalamazoo.  (Tr. VI at 119.)  At about 11:30 a.m., Johnson heard noise and saw 15-20 police officers all over the neighborhood with shotguns and rifles.  (Tr. VI at 119-20, 125.)  Johnson saw the Chief of Police on Johnson's front steps, with his gun drawn.  (Tr. VI at 120, 128.)  Police had blocked off the street. (Tr. VI at 121.)  The police remained for about 20 minutes and spoke with Cowen, though they did not have their guns drawn at that time.  (Tr. VI at 130.)

Mary Gault's daughter, Sarah Lockmiller, testified that she had known Petitioner for about three years.  (Tr. VI at 140.)  Petitioner came to the Gault home about twice each month for dinner.  (Tr. VI at 140.)  Lockmiller testified that on Tuesday, July 12, 2000, she was working from 3:00 p.m. until midnight.  (Tr. VI at 142.)  When she got out of work, she went over to check on Petitioner at the church at about 12:20 a.m. and stayed to visit with him for about an hour.  (Tr. VI at 142-44, 146.)  Lockmiller later testified that she went to the church on Wednesday rather than Tuesday.  (Tr. VI at 146.)

Grace Cowens testified that she began dating Petitioner in June 1999 and he moved into her apartment in August 1999.  (Tr. VII at 6, 8.)  They began to talk about being married.  (Tr. VII at 6.)  In November 1999, the relationship began to decline because of the strain caused by Petitioner's involvement in public meetings.  (Tr. VII at 7-8.)  By June, the two had talked about Petitioner moving to his own place.  (Tr. VII at 9.)  Cowen learned of Deborah Gordon in July 2000, but it did not precipitate the break-up.  (Tr. VII at 10.)  On Monday, July 10, Cowen and Petitioner agreed that, after Mary Gault came back from her trip, they would look for housing for Petitioner.  Cowen asked Petitioner to get his belongings together and he moved out that Monday.  (Tr. VII at 10-11.)  On Wednesday at 9:00 a.m., Petitioner called Cowen and she agreed to meet him at a restaurant to bring important documents.  (Tr. VII at 12.)  She then dropped Petitioner off at an attorney's office.  (Tr. VII at 14.)  After running some errands, she arrived home at about 1:30 p.m.  (Tr. VII at 14.)  She checked her caller ID and saw four or five phone calls from Gordon.  (Tr. VII at 17.)  She then heard noise from her porch and saw her neighbor, Lester Keys, who said, "Don't come out here right now, Grace.  There's someone out here who's threatening to shoot you."  (Tr. VII at 22-23.)  Although she could not see the person initially, she could hear profanity from the

street saying, "Come get your shit . . . ."   (Tr. VII at 23.)  She then saw Gordon get back into her

car, at which point Cowen called 911.  (Tr. VII at 24.)  Cowen made a report to the police officer

who responded.  The following day, Cowen filed for a personal protection order against Gordon.

(Tr. VII at 26-27.)

     On Wednesday evening at approximately 9:00 p.m., Cowen received a call from

Petitioner, who asked her to bring documents to him at Gault's church.  She did so at about 10:00

p.m. (Tr. VII at 27.)  On Thursday morning at about 11:30 a.m., as she was leaving her house, she

looked toward her back yard and saw an officer standing at the end of the driveway.  (Tr. VII at 28-

29.)  As she walked toward the officer, she noticed two other officers.  (Tr. VII at 29.)  One officer

had a gun drawn.  (Tr. VII at 30.)  The officers told her that Officer McClenney was in front of her

house and needed to speak with her.  (Tr. VII at 31.)  She spoke with McClenney and told him that

she had not seen Petitioner.  (Tr. VII at 33.)  While she was speaking with McClenney, the Chief

of Police arrived.  (Tr. VII at 33.)  She asked the Chief if the officers had a warrant and then ordered

the police off her property.  (Tr. VII at 34.)  When they did not leave, she called her attorney, Ms.

Pugh, who arrived in 20 to 25 minutes.  (Tr. VII at 35.)  Eventually, Cowen allowed McKenney and

one other officer to search her home.  (Tr. VII at 38.)  Cowen testified that she was worried that

Petitioner could have been shot if he had been there.  (Tr. VII at 39.)  She estimated that between

16 and 18 officers were outside on the street that day.  (Tr. VII at 49.)  On cross-examination,

Cowen acknowledged that she never saw a SWAT team of officers with long guns or assault rifles,

and she testified that she did not see her neighbor, George Johnson, outside that day.  (Tr. VII at 49.)

The defense rested.  (Tr. VII at 58.)

- 30 -

On rebuttal, the prosecutor presented the testimony of Nicole Boyd, the administrative assistant at Folk Oil Company, which owns 22 PC Mobile Marts, including the one on Helmer near I-94, where Sarah Lockmiller worked.  (Tr. VII at 59.)  Boyd testified that, notwithstanding Lockmiller's testimony that she was certain she had worked from 3:00 p.m. until midnight on July 12, 2000, Lockmiller had worked from 4:30 a.m. until 3:50 p.m.  (Tr. VII at 60.)  Lockmiller worked again on July 13, 2000 from 4:30 a.m. until 3:00 p.m.  (Tr. VII at 60-61.)

Patricia Martin testified that, in December 2000, she met Petitioner, who was accompanied by an ex-girlfriend, Angie McKenzie, whom Martin had known for years.  (Tr. VII at 63.)  As the result of her acquaintance with Petitioner, Martin met Mary Gault.  (Tr. VII at 65.)  Martin identified Gault in the courtroom, notwithstanding Gault's testimony that she did not know Martin.  (Tr. VII at 65.)  When he was staying at the Super 8 Motel, Petitioner had to move, so Martin and her husband helped Gault and Angela McKenzie move Petitioner to the Motel 6.  The Martins later assisted in Petitioner's move to the Birkwood Inn.  (Tr. VII at 65.)  Martin testified that Gault was the one who got the deposit back at the Motel 6.  (Tr. VII at 65.)  During this time, Gault told Martin that the police were out to kill Petitioner.  (Tr. VII at 67.)

Michelle Reed also testified on rebuttal.  In December 2000 and January 2001, she was living in an apartment in Lansing.  (Tr. VII at 69.)  She met Petitioner through Patricia Martin, who was the manager of the Hot-'n-Now Restaurant where Reed worked.  (Tr. VII at 69.)  Reed became friendly with Petitioner and went to visit him at the Days Inn Motel, where he was staying at that time.  (Tr. VII at 70.)  Reed met Mary Gault at the hotel.  (Tr. VII at 71.)  After a couple of weeks, Petitioner moved into Reed's apartment, with Gault's help.  Thereafter, Gault visited about once each week, and sometimes Gault and Reed went to get groceries for Petitioner.  (Tr. VII at 72-

- 31 -

73.)  Petitioner never went out of the apartment.  (Tr. VII at 74.)  Gault also routinely gave Petitioner

money.  (Tr. VII at 74-75.)

        Luella Dale of the Super 8 Motel in Lansing testified that she met Petitioner at the

motel in approximately October 2008.  She identified the motel records showing registrations for

"Robert Gault" and for "Mary Gault."  (Tr. VII at 80.)

        At the conclusion of trial, on March 1, 2002, the jury found Petitioner guilty of

kidnaping, assault with intent to commit great bodily harm less than murder, felonious assault, being

a felon in possession of a firearm, and two counts of felony firearm.  (Tr. VIII at 3.)  On March 14,

2002, Petitioner was sentenced to serve two consecutive terms of two years on the felony firearms

charges, to be served prior to concurrent sentences of 8 to 20 years for assault with intent to do great

bodily harm, 35 to 60 years for kidnaping, 4 to 15 years for felonious assault, and 4 to 10 years for

being a felon in possession of a firearm.  (Sentencing, Tr. IX at 38-39, docket #38.)

## B.  Direct Appeal

        Petitioner filed a notice of appeal to the Michigan Court of Appeals on April 5, 2002.

On May 9, 2002, Petitioner, proceeding pro per filed in the trial court a motion for directed verdict

or, in the alternative, for a new trial.  Appellate counsel was appointed, and following the production

of transcripts, counsel filed a supplemental brief.   The trial court heard the motion on November

18, 2002, and denied relief.  (11/18/02 Hrg. Tr., docket #3.)  Shortly after the hearing, Petitioner

sought a substitution of counsel based on a breakdown in the attorney-client relationship.  Following

a hearing, the motion was denied.  (1/6/03 Hrg. Tr., 12, docket #41.)  Counsel filed a motion in the

Michigan Court of Appeals, seeking remand for appointment of substitute appellate counsel.  (Mot.

for Remand, docket #42.)  The court of appeals denied the motion to remand on July 16, 2003.

(7/16/03 Ord., docket #42.)

    Petitioner's appellate brief was filed by counsel on February 4, 2003.  The brief

raised three issues: (1) trial counsel was ineffective in failing to stipulate to Petitioner's status as a

prior felon, failing to object to the use of evidence about third-party threats against the complainant,

and failing to comply with discovery rules; (2) the trial court violated Petitioner's due process right

to cross-examine the complainant by excluding evidence of the complainant's mental disorder; and

(3) the trial court violated Petitioner's due process right to present a defense by excluding defense

exhibits as an excessive remedy for the defense's discovery violation.  (*See* Def.-Appellant's Br. on

Appeal, docket #42.) Petitioner filed a pro per supplemental brief on appeal, raising five additional

issues: (1) he was denied a fair trial by the use of knowingly false material evidence bearing on the

credibility of two key prosecution witnesses; (2) he was denied his right to the effective assistance

of trial counsel when his attorney failed to adequately cross-examine witnesses; (3)  he was denied

his right to the effective assistance of trial counsel and his right to confront witnesses when witness

statements were excluded as a sanction for a discovery violation; (4) he was denied the effective

assistance of counsel when witnesses were not impeached with prior convictions bearing on honesty;

and (5) he was denied the effective assistance of counsel when his attorney failed to contest the

amount of restitution. (*See* Def.-Appellant's Supp. Br. on Appeal, docket #42.)  By unpublished

opinion issued on September 20, 2003, the Michigan Court of Appeals rejected all appellate

arguments and affirmed Petitioner's convictions and sentences.  (*See* 9/20/03 Mich. Ct. App.

Opinion (MCOA Op.), docket #42.)  Petitioner sought reconsideration, which was denied on

November 13, 2003.  (*See* 11/13/03 MCOA Ord. Denying Reconsid., docket #42.)

Petitioner filed an application for leave to appeal to the Michigan Supreme Court. Counsel for Petitioner raised the same three arguments raised in the court of appeals, and Petitioner filed a pro per brief raising the same five claims presented to the Michigan Court of Appeals.  By order entered May 28, 2004, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #43.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the

- 34 -

decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be  instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).       A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

- 35 -

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.  *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).  Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*.  *Onifer*, 255 F.3d at 316.  The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  *Harris*, 212 F.3d at 943.

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1);  *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

I..    Due Process – False Testimony

In his first ground for habeas relief, Petitioner contends that he was deprived of his Fourteenth Amendment right to due process and Sixth Amendment right to a fair trial when the prosecutor knowingly introduced fabricated evidence directly bearing on the credibility of its two key witnesses.  Specifically, Petitioner argues that Nicole Sparks' 911 call was wrongly introduced

- 36 -

because, by Deborah Gordon's testimony at the preliminary examination, Gordon had not yet told

Sparks what had happened when she made the 911 call.  Petitioner therefore contends that Sparks'

call to 911 was false and the prosecutor was aware of that falsehood.

    Petitioner's argument was raised in his pro per supplemental brief on appeal in the

Michigan Court of Appeals.  The court of appeals summarily rejected all five of Petitioner's

supplemental issues, stating:

> Finally, defendant raises a number of issues in a supplemental pro per brief.
> We have carefully reviewed those issues and none merit reversal.

(MCOA Op. at 5.)  Where, as here, the state court did not articulate its reasoning, the Court conducts

an independent review to determine if the state court's *result* is contrary to federal law, unreasonably

applies clearly established law, or is based on an unreasonable determination of the facts in light of

the evidence presented.  *See Harris*, 212 F.3d at 943; *McKenzie*, 326 F.3d at 727.  The decision of

the Michigan Court of Appeals was patently reasonable.

    The Supreme Court repeatedly has recognized that "deliberate deception of a court

and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands

of justice.'"  *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294

U.S. 103, 112 (1935)).

> The knowing use of false or perjured testimony constitutes a denial of due process
> if there is any reasonable likelihood that the false testimony could have affected the
> judgment of the jury. In order to establish prosecutorial misconduct or denial of due
> process, the defendants must show (1) the statement was actually false; (2) the
> statement was material; and (3) the prosecution knew it was false. The burden is on
> the defendants to show that the testimony was actually perjured, and mere
> inconsistencies in testimony by government witnesses do not establish knowing use
> of false testimony.

*United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citations omitted).  *See also Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998).  Petitioner bears the burden of demonstrating that the testimony was actually perjured. *Lochmondy*, 890 F.2d at 822.  "[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony."  *Id.*

Here, the jury heard the testimony of both Ms. Sparks and Ms. Gordon.  Both witnesses testified that Sparks did not know the details of the assault prior to Sparks' calling 911, other than the fact that Gordon had been beaten.  The minor inconsistencies between the two witnesses, both of whom testified that they could not remember all of the details of the timing more than two years after the event, fall far short of demonstrating that the testimony was known to be false at the time of trial. *Lochmondy*, 890 F.2d at 822.  Moreover, the defense was free to cross-examine both witnesses and to point out any inconsistencies in their testimony at trial and at the preliminary examination.  Petitioner has failed entirely to demonstrate a violation of due process.  The court of appeals' decision rejecting Petitioner's claim was neither contrary to nor an unreasonable application of established Supreme Court precedent. 28 U.S.C. § 2254(d); *Harris*, 212 F.3d at 943; *McKenzie*, 326 F.3d at 727.

II.     Exclusion of Evidence

In his second ground for habeas relief, Petitioner contends that the trial court both abused its discretion under state law and violated Petitioner's Sixth and Fourteenth Amendment rights by excluding from evidence, as a discovery sanction, the two letters sent by Gordon to Cowens.  Petitioner argues that the letters bore upon Gordon's credibility by demonstrating her bias and vindictiveness.  He therefore contends that the exclusion of the evidence prevented him from effectively testing the evidence against him.  Similarly, in the third ground of his habeas application,

Petitioner argues that the exclusion of material evidence of Gordon's mental health disorder deprived him of a fair trial and the right to confront witnesses.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  As a result, Petitioner's state-law evidentiary claim is not cognizable on habeas review.

The Supreme Court has determined that a criminal defendant has the right to a "meaningful opportunity to present a complete defense."  *California v. Trombetta*, 467 U.S. 479, 485 (1984).  The right is derived from the Sixth Amendment rights to compel and to confront witnesses and from the Due Process Clause of the Fourteenth Amendment.  *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14, 19 (1967) ("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process law.").

The Supreme Court, however, repeatedly has recognized that the right to present a defense is subject to reasonable restrictions.  *See United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (the Sixth Amendment does not confer on the accused an "unfettered right to offer testimony that is incompetent, privileged, or otherwise

- 39 -

inadmissible under standard rules of evidence"); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987);

*Chambers*, 410 U.S. at 295; *see also Wong v. Money*, 142 F.3d 313, 325 (6th Cir. 1998).

> "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve. Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.

*Scheffer*, 523 U.S. at 308 (internal citations omitted). In order for a claimed violation to rise to the

level of constitutional deprivation, the evidence sought to be introduced must be deemed to have

been "particularly significant" or a "fundamental element of the accused's defense."

Similarly, the Confrontation Clause of the Sixth Amendment guarantees to the

criminal defendant the right "to be confronted with the witnesses against him." U.S. CONST., am.

VI, cl. 5. The Supreme Court has held that this right "means more than being allowed to confront

the witness physically. 'Our cases construing the [confrontation] clause hold that a primary interest

secured by it is the right of cross-examination.'" *Davis v. Alaska*, 415 U.S. 308, 315 (1974)

(recognizing the importance of cross-examining a witness regarding bias) (quoting *Douglas v.

Alabama*, 380 U.S. 415, 418 (1965)). The Confrontation Clause generally guarantees only "an

opportunity for effective cross-examination," *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). It

does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the

defense might wish." *Id.* at 20; *see also Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). In

*Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), the Court made clear that in the exercise of this

right, "the accused, as is required of the State, must comply with established rules of procedure and

evidence designed to assure both fairness and reliability in the ascertainment of guilt and

innocence." The right to present relevant evidence during cross-examination "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers*, 410 U.S. at 295; *accord Rock v. Arkansas*, 483 U.S. 44, 55 (1987) ("The right to present relevant testimony is not without limitation.").[2]

In addition, unconstitutional limitations on cross-examination are subject to harmless error analysis. *See Hargrave v. McKee*, 248 F. App'x 718, 728 (6th Cir. 2007) (citing *Van Arsdall*, 475 U.S. at 681-84); *Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007). On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*[*v. California*, 386 U.S. 18, 21-22 (1967)] . . . ." *Fry*, 127 S. Ct. at 2328; *see also Vasquez v. Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007); *Hargrave*, 248 F. App'x at 738. The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. *Brecht*, 507 U.S. at 638. In determining whether the restriction was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave*, 248 F. App'x at 728 (quoting *Van Arsdall*, 475 U.S. at 684).

---

[2]The Sixth Circuit has held that *Crawford* is not retroactive to cases that were final before the case was decided. *See Dorchy v. Jones*, 398 F.3d 783 (6th Cir. 2005). The Supreme Court issued its decision in *Crawford* on March 8, 2004. The Michigan Supreme Court denied leave to appeal Petitioner's conviction on May 28, 2004, and the decision was not final until the expiration of the 90-day period in which he could have sought a writ of certiorari in the Supreme Court. As a consequence, Petitioner's conviction therefore did not become final until after *Crawford* was decided. *Crawford* therefore is applicable to the instant case.

A.        **Gordon's letters to Cowen**

Petitioner argues that the trial court violated his right to a fair trial under the Fourteenth Amendment and his right to confront witnesses under the Sixth Amendment by refusing to allow the admission of the letters sent from Gordon to Cowen and refusing to allow defense counsel to quote from the letters during cross-examination.  The Michigan Court of Appeals rejected Petitioner's compound claim, concluding that, even if the exclusion was erroneous, that error was harmless beyond a reasonable doubt, in accordance with *Chapman*, 386 U.S. at 21-22:

> Defendant does make a strong argument that a lesser sanction, such as a continuance to allow the prosecutor to review the letters, would have been a more appropriate remedy.  But in the final analysis, we are persuaded that any error by the trial court in handling this matter was harmless beyond a reasonable doubt.  As discussed above under the claim of ineffective assistance of counsel, defendant was permitted to fully cross-examine the victim on what she wrote in these letters.  Moreover, defendant points to nothing in the victim's testimony which was inconsistent with the letters.  Thus, while defendant was prevented from using the letters as an exhibit, he was able to make his argument that the victim was vindictive towards defendant.  Accordingly, even if the trial court erred in this respect, we are not persuaded that it is more probable than not that any such error was outcome determinative.

(MCOA Op. at 5.)

Petitioner contends that, by barring the introduction of the actual letters sent by Gordon and barring cross-examination that quoted those letters, the trial court prevented him from effectively cross-examining Gordon about her bias and motive for giving false evidence against him.  I disagree.  Unlike in *Van Arsdall*, 475 U.S. at 679, the trial court did not "prohibit[] *all* inquiry" into Gordon's possible bias and motivation to lie.  *Id.* (emphasis in original); *see also Vasquez*, 496 F.3d at 571 (recognizing distinction between barring all inquiry into a witness' bias and barring a particular form of cross-examination).  Contrary to Petitioner's representations, he was not prevented from effectively cross-examining Gordon on the issue of her bias.  Indeed, defense

counsel extensively cross-examined Gordon about the content of the letters, her motive for sending those letters, and the numerous calls made by Gordon to Cowen.  (Tr. II at 153-61, 165-66.)  Gordon openly acknowledged having sent the letters, and she admitted that she was angry and hurt by Petitioner's continued involvement with Cowen.  (Tr. II at 19.)  She also acknowledged that she was sexually graphic in the letters and that she intended to hurt Petitioner.  (Tr. II at 154.)  And defense counsel highlighted Gordon's motive during his closing argument.  (Tr. VIII at 136.)  As a consequence, Petitioner has failed to demonstrate the sort of limitation on his right to present a defense that would violate either the Due Process Clause or the Confrontation Clause.  *See Van Arsdall*, 475 U.S. at 679.

Moreover, even were I to conclude that the trial court's limitation on the use of the letters was constitutionally impermissible, Petitioner would not be entitled to relief on habeas review because any error was harmless.  As I previously noted, unconstitutional limitations on cross-examination are normally subject to harmless-error analysis.  *Hargrave*, 248 F. App'x at 728.

The Michigan Court of Appeals concluded that the exclusion of the letters and the corresponding limitation on cross-examination were harmless beyond a reasonable doubt under the *Chapman* standard.  The court of appeals determined that defendant was permitted to fully cross-examine the victim on what she wrote in the letters and to explore her vindictiveness toward Petitioner.  The court also concluded that Petitioner was able, through the victim's testimony, to bring the content of the letters to the jury's attention and to argue her vindictiveness to the jury.  (MCOA Op. at 5.)

On review, I conclude that the facts relied upon by the state court to find harmlessness under the *Chapman* standard also support a finding that the limitation on cross-

- 43 -

examination was harmless under the *Brecht* standard.  While Gordon's testimony was critical to the prosecution's case, Gordon was subjected to intense cross-examination on all aspects of her testimony, including her potential bias.  The fact that Gordon sent the letters and that the letters were explicit and designed to hurt Petitioner was undisputed.  As a result, introduction of the letters themselves was only marginally helpful to the defense because it was cumulative of the evidence of vindictiveness already before the jury.  Moreover, Gordon's testimony about the charged offenses was well supported by consistent telephone records and physical evidence at the scene.  In sum, applying the *Van Arsdall* factors, I conclude that the limitation on the use of the letters did not have a "substantial and injurious effect" on the result.  *Brecht*, 507 U.S. at 638.

### B.      Evidence of Complainant's Mental Health Disorder

Petitioner contends that his rights under the Confrontation Clause were violated by the trial court's refusal to allow defense counsel to question Gordon about prior mental health treatment. He contends that the denial of his right to confront Gordon denied him his right to present a complete defense under the Due Process Clause. *See Trombetta*, 467 U.S. at 485.

Following a lengthy analysis, the Michigan Court of Appeals rejected Petitioner's argument as follows:

Defendant's second argument is that the trial court erred by excluding evidence of the victim's mental disorder to show why the victim would testify falsely. We disagree. While the trial court did limit defendant's inquiry in this area, defendant has made no offer of proof that the victim did, in fact, suffer from any such mental disorder. At most, defendant points to the victim's testimony at the preliminary examination where she supposedly admitted to receiving SSI benefits for a mental disorder. But defendant is being selective about what portion of her testimony he considers in making his point. The following exchange took place at the preliminary examination between defense counsel and the victim:

Q. Okay. Are you receiving SSI for any mental disorder?

- 44 -

      A.  Yes, sir.

This prompted an objection, which le[d] to the following exchange:

      MR. WEINER [Defense Counsel]:  I want to know what this is for.  What's she receiving it for, the SSI?

                         * * *

      THE COURT:  All right.  You can answer it.

      THE WITNESS:  I get SSI because I injured my back at Fedco on Superior Street in Albion in 1995.  I sued them and that's why I get disability.  I have a degenerative disk disease in my back and a pinched sciatic nerve.

Thus, while the victim did initially respond "yes" to whether she was receiving SSI benefits for a mental disorder, her more detailed answer clearly reflects that this is not the case.  The more logical explanation is that she misheard or misunderstood the original question and her fully articulated answer reflects that she was not receiving SSI benefits for a mental disorder.  Moreover, the victim testified that she had not been treated for mental illness or suicidal tendencies.  She did admit to having previously suffered from a panic attack, but that hardly establishes a mental illness that would lead to her falsely accusing defendant as a result.

      The Supreme Court's decision in *People v. Stanaway*, [521 N.W.2d 557 (Mich. 1994)], is instructive in this regard.  *Stanaway* considered a defendant's access to a witness's mental health treatment records.  The Court reaffirmed that such records are generally privileged, but did allow the option of an in camera inspection of those records by the trial court where the defendant has demonstrated a good-faith belief, grounded in demonstrable fact, that there is a reasonable probability that those records would contain information favorable to the defendant. In the case at bar, defendant has not pointed to any demonstrable fact to support the basis for his inquiry.

      Indeed, the lack of an offer of proof regarding any alleged mental disorder by the victim renders us unable to meaningfully review this issue.  As a result, we cannot say that the trial court abused its discretion in excluding the inquiry.  In short, defendant was merely looking to engage in a fishing expedition, hoping to find something or at least smear the victim's credibility in the process without any factual basis for engaging in the inquiry.  We are not persuaded that the trial court erred in precluding this line of questioning.

(MCOA Op. at 3-4, docket #42 (footnotes omitted).)

The Michigan Court of Appeals' decision was entirely reasonable.  Petitioner failed on appeal and fails in his habeas petition to identify any basis for his suggestion that Gordon suffered from a mental health disorder.  Gordon's testimony at the preliminary examination provides no support for the theory, as Gordon fully explained that she was not receiving benefits for a mental health disorder.  (Tr. Prelim. Exam. at 70-71, docket #22.)  Gordon further testified at that hearing that she had no history of suicide attempts or mental illness.  (Tr. Prelim. Exam. at 71, docket #22.)  At trial, Gordon was questioned about the medications she took and she identified what those medications were and what conditions they were taken to remedy.  None was related to a mental health disorder.  (Tr. II at 140.)

Petitioner therefore has failed to demonstrate any basis for concluding that the limitation on cross-examination in any way impaired his right to confrontation or to present a complete defense.  As a consequence, the court of appeals' determination that the trial court properly limited cross-examination was based on reasonable factual findings from the record and constituted a reasonable application of established Supreme Court precedent.  28 U.S.C. § 2254(d).

Moreover, because Petitioner provides no evidence that additional cross-examination would have revealed any mental health impairment, he cannot demonstrate that he was prejudiced by the inability to question Gordon about her mental health condition.  As a result, applying the *Van Arsdall* factors, I conclude that Petitioner has failed to show that the limitation on cross-examination about Gordon's mental health had a "substantial and injurious effect" on the result.  *Brecht*, 507 U.S. at 638.

- 46 -

II.    Ineffective Assistance of Counsel

In his fourth ground for habeas relief, Petitioner argues that he was deprived of his Sixth Amendment right to the effective assistance of counsel when his attorney failed to compel the government to disclose the prior and pending criminal histories of its key witnesses, Deborah Gordon and Nicole Sparks.  Petitioner specifically alleges that, at the time of her testimony at Petitioner's trial, Nicole Sparks was the subject of pending charges in the Calhoun County Circuit Court for theft and for cashing federal checks over $500.00.  Deborah Gordon, he alleges, had been convicted in Calhoun County of welfare fraud and perjury.  Neither criminal record was disclosed by the prosecution prior to trial.  Petitioner argues that the material constituted exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Petitioner does not, however, bring a claim of prosecutorial misconduct.  Instead, he argues that his trial attorney was ineffective in neglecting to follow-up on an initial request for the records until after both witnesses had testified.  (Tr. VI at 66-67.)

Petitioner raised his claim in his pro per supplemental brief on appeal.  The Michigan Court of Appeals summarily rejected the issue.  (MCOA Op. at 5.)  As previously discussed, where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.  *See Harris*, 212 F.3d at 943; *McKenzie*, 326 F.3d at 727.  Where, as here, the state court actually considered the issue, the review is not *de novo*.  *Onifer*, 255 F.3d at 316.  The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  *Harris*, 212 F.3d at 943.  Upon review, I concluded

that the state court's determination was neither contrary to nor an reasonable application of established Supreme Court precedent.

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1).  *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

"When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'"  *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697).  "If it is

- 48 -

easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.  In order to show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  When analyzing an attorney's performance, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that counsel rendered reasonable professional assistance." *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (quoting *Strickland*, 466 U.S. at 690).

Petitioner cannot demonstrate the necessary prejudice.  First, it is apparent from the record that counsel for Petitioner had received the criminal history of the complainant, Deborah Gordon.  In raising his belated objection to the prosecution's lack of disclosure, defense counsel contended only that he had not received the criminal history of Nicole Sparks:

> MR. WHITE:  Your Honor, one last matter and that's just for the record.  In the original – not original, when Mark Madison was the attorney I think there was a request made for the complete criminal history of all the witnesses.  We're under the belief that there were two civilian witnesses that had criminal histories.  Both the complaining witness and her daughter-in-law and we were not furnished with the criminal history of the daughter-in-law.  We want that established on the record.

(Tr. VI at 66.)  In addition, Gordon admitted on direct examination that she had two convictions, in 1991 and 1992, for writing checks without sufficient funds.  (Tr. II at 79.)  As a result, the jury was made aware that Gordon had been convicted of offenses bearing on her truthfulness.

With respect to Nicole Sparks, Petitioner alleges no more than that Sparks had been charged with a crime, not that she had been convicted of one. As a result, even assuming that the evidence was admissible, it would demonstrate little about Sparks' credibility. Indeed, Petitioner does not now contend that Sparks ever was convicted of any offense.

Further, defense counsel engaged in extensive cross-examination of all prosecution witnesses and otherwise provided a vigorous defense. Given the limited evidentiary value of the missing criminal record evidence, and in light of the extensive testimonial and corroborating evidence against Petitioner, I am not persuaded that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Upon review, I conclude that the decision of the Michigan Court of Appeals was not an unreasonable application of established Supreme Court precedent.

IV.   <u>Cumulative Error</u>

In his final ground for habeas relief, Petitioner argues that, even if the Court should reject his individual constitutional claims, those claims, viewed cumulatively, warrant relief. I disagree.

Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law. *Bailey*, 271 F.3d at 655. The Sixth Circuit repeatedly has stated that claims of cumulative error are not cognizable on habeas review. "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004); *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004);

- 50 -

*Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002).  Moreover, because I concluded above that the individual claims are without merit, Petitioner cannot show that the cumulative error violated his constitutional rights.  *See Seymour*, 224 F.3d at 557.

Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:  September 2, 2008                          /s/ Hugh W. Brenneman, Jr.
                                                   HUGH W. BRENNEMAN, JR.
                                                   United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within eleven (11) days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).